

# SUPREME COURT OF MISSOURI
## en banc

IN RE:  SANFORD P. KRIGEL,         )
                                            )     No. SC95098
                                            )
             Respondent.           )

### ORIGINAL DISCIPLINARY PROCEEDING

*Opinion issued January 26, 2016*

The Office of Chief Disciplinary Counsel (hereinafter, "OCDC") seeks to discipline Sanford P. Krigel's (hereinafter, "Krigel") law license for alleged multiple violations of the Rules of Professional Conduct.  This Court finds that Krigel committed violations of Rule 4-3.3(a)(3) (knowingly offering false evidence), Rule 4-4.1(a) (false statement of material fact), Rule 4-4.4(a) (using means to improperly burden or delay a third person), and Rule 4-8.4(d) (conduct prejudicial to the administration of justice).  Krigel is suspended from the practice of law for six months, with execution of such suspension stayed, subject to Krigel's completion of a two-year term of probation in accordance with conditions imposed by this Court.

### Factual and Procedural History

Krigel was admitted to The Missouri Bar in September 1976.  He has no disciplinary history, and his license is in good standing.  He is an owner, founder, and managing partner of Krigel & Krigel.  Krigel has substantial experience in the practice of law and specializes in adoption law.

This matter arises from Krigel's representation of an unmarried, pregnant, eighteen year old woman (hereinafter, "Birth Mother") in 2009. Birth Mother became unexpectedly pregnant while in a monogamous relationship with her boyfriend (hereinafter, "Birth Father"). Birth Mother and Birth Father discussed various options for dealing with this pregnancy. Ultimately, they made no decision other than to hide the pregnancy from their parents until Birth Mother was approximately eight months pregnant.

Birth Mother and Birth Father both resided with their respective families. On March 5, 2010, Birth Mother, Birth Father, and both sets of their parents came together to discuss the pregnancy. During this discussion, Birth Father declared he wanted to raise the child at his home with his parents and that he did not want to place the child up for adoption. This discussion precipitated a sharp decline in the relationship between the birth parents. Birth Mother and Birth Father ended their relationship, and Birth Mother's parents initiated steps to prevent Birth Father from having further contact with Birth Mother.

Birth Father retained Jeff Zimmerman (hereinafter, "Zimmerman"), an attorney, in connection with the pregnancy. Meanwhile, Birth Mother contacted Hillary Merryfield[1] (hereinafter, "Merryfield"), seeking information regarding options available to her and requesting an attorney referral. Merryfield referred Birth Mother to Krigel; Merryfield and Krigel had worked together on adoption matters for approximately twenty years.

---

[1] Merryfield is a licensed clinical social worker in both Missouri and Kansas. Merryfield operates a licensed child placement agency, Adoption Option Inc., which counsels birth mothers and couples seeking adoption. Additionally, Merryfield works for Missouri and Kansas courts to provide home studies for prospective adoptive parents.

Krigel met with Birth Mother and her parents on March 11, 2010. Birth Mother and her parents advised Krigel of the background, pregnancy, and relationship with Birth Father and its deterioration earlier in the month. Birth Mother indicated that originally she and Birth Father discussed raising the child together, but since the deterioration of their relationship, she believed that it would be best for the child to be adopted by a family. Birth Mother provided Krigel with her April due date as well as Birth Father's name and residence. There was no doubt in Birth Mother's mind as to the actual paternity of the child. Krigel was told that Birth Mother and Birth Father were to communicate only through attorneys. Further, Krigel was informed that Birth Father would not consent to an adoption.

Krigel explained to Birth Mother her rights under Missouri law and the rights of a biological father to assert paternity. Krigel described the relevant time frames in which a biological father had to assert his parental rights to have his consent required for an adoption. Ultimately, the family retained Krigel to assist Birth Mother in terminating her parental rights in anticipation of a subsequent adoption proceeding.

Krigel employed a "passive strategy" in his representation of Birth Mother. Accordingly, Krigel and Birth Mother would "actively do nothing" to communicate with Birth Father or his counsel; they would not advise Birth Father or his counsel of the adoption plans, the birth of the child, and the instigation of any legal proceedings.

On March 19, 2010, Krigel received a telephone call from Zimmerman. Krigel knew Zimmerman practiced law primarily in Kansas, and he did not believe Zimmerman typically handled adoption or paternity matters. Krigel represented to Zimmerman that

3

the child would not be adopted without Birth Father's consent. Zimmerman stated that he believed Birth Mother and Birth Father needed to be counseled regarding their situation without the presence of their parents. Krigel suggested Birth Mother and Birth Father meet with Merryfield, knowing Birth Mother was working with Merryfield already and pursuing an adoption for the child. Subsequently, Zimmerman contacted Merryfield to obtain an appointment for Birth Mother and Birth Father to obtain counseling and attempt to reconcile a unified course of action for the child.

On March 22, 2010, Birth Mother and Birth Father met with Merryfield. At the meeting, Birth Father stated he would not consent to an adoption, and he wanted to raise the child, preferably with Birth Mother. After the meeting, Merryfield contacted Krigel and informed him that Birth Father did not want to consent to an adoption. However, Merryfield thought that Birth Father probably would not contest the adoption because she characterized him as quiet, sad, and passive.

Birth Mother contacted Birth Father in late March. Birth Mother informed him that her expected due date had changed from early April to early May. This statement was intended to deceive Birth Father of the real due date.

The child was born. Neither Birth Father nor Zimmerman was informed of the child's birth. Birth Father's name was not indicated on the birth certificate.

On April 6, 2010, there was a "Consent to Terminate Parental Rights" hearing in Jackson County, Missouri, allowing Birth Mother to terminate her parental rights in preparation for adoption proceedings. Neither Birth Father nor Zimmerman was aware of the hearing, and accordingly, they did not appear. In response to a question by Krigel,

4

Birth Mother agreed that Birth Father "had been consulted at length about the matter." Birth Mother also agreed when Krigel asked "even though you've talked to him and his family at some length, he has not stepped forward since the birth of the child claiming any rights to the child." Birth Mother's parental rights were terminated. Immediately thereafter, a "Motion to Transfer Custody and for Adoption" was heard. The custody of the child was transferred to the prospective adoptive parents.

At some point between May 3 and May 12, 2010, Birth Father learned of the child's birth and the deception regarding Birth Mother's expected due date. Birth Father then placed his name on the Putative Father Registry. Later in May, Birth Father learned of the adoption proceedings, and he moved to intervene. On May 6, 2011, the trial court entered its judgment in the adoption proceedings, denying the petition of the adoptive parents and awarding legal and physical custody of the child to Birth Father.

The OCDC filed an information against Krigel in February 2014. Krigel did not admit to any violation of the Rules of Professional Conduct that were alleged in the information. In December 2014, the Disciplinary Hearing Panel (hereinafter, "DHP") conducted an evidentiary hearing .

*The Disciplinary Hearing Panel*

Following its hearing, the DHP found Krigel violated four rules of professional conduct: Rule 4-3.3(a)(3); Rule 4-4.1(a); Rule 4-4.4(a); and Rule 4-8.4(d). The DHP did not make any findings regarding aggravating or mitigating factors. The DHP recommended Krigel be suspended indefinitely from the practice of law with no leave to apply for reinstatement for six months.

5

The OCDC accepted the DHP's recommendation.  However, Krigel rejected the DHP's recommendation, believing that no sanction for his actions should be imposed.  Krigel asks this Court to dismiss the information against him.  Because Krigel rejected the DHP's recommendation, this Court must determine the appropriate discipline.  Rule 5.19(d)(3).

## Standard of Review

The DHP's findings of fact and conclusions of law are advisory.  *In re Belz*, 258 S.W.3d 38, 41 (Mo. banc 2008).  "This Court [in a disciplinary proceeding] reviews the evidence *de novo*, independently determining all issues pertaining to credibility of witnesses and the weight of the evidence, and draws its own conclusions of law."  *In re Snyder*, 35 S.W.3d 380, 382 (Mo. banc 2000).  "Professional misconduct must be proven by a preponderance of the evidence before discipline will be imposed."  *In re Madison*, 282 S.W.3d 350, 352 (Mo. banc 2009) (quoting *In re Crews*, 159 S.W.3d 355, 358 (Mo. banc 2005)).

## Krigel's Conduct

Based on the record before this Court, Krigel committed multiple violations of the Rules of Professional Conduct.  This Court finds Krigel to have violated the following rules:

*Violation of Rule 4-3.3(a)(3)*

Rule 4-3.3(a)(3) requires a lawyer shall not knowing "offer evidence that the lawyer knows to be false …."  Krigel's questioning of Birth Mother at that hearing was

6

designed to mislead the trial court as to the actual circumstances between Birth Mother and Birth Father.

Prior to the April 2010 hearing, Krigel and Birth Mother discussed his intended examination of her. Krigel's questioning of Birth Mother at that hearing, while technically truthful, omitted essential information. While representing there was a belief Birth Father may not actively pursue opposition to the adoption, there was no indication that Birth Father stated his acquiescence to adoption. Krigel knew Birth Father was uninformed about the child's birth, his name was omitted from the child's birth certificate, and his attorney had contacted Krigel to work cooperatively on the child's future placement and prevent adoption. Birth Mother's testimony further indicated that Birth Father was able to be in continuous communication with her, which Krigel knew was untrue. Birth Mother also stated that Birth Father had not visited the hospital after the birth, which was true, but Krigel failed to clarify that Birth Father was not informed of the time or place of the child's birth. Krigel's representation to the trial court via his questioning, by permitting false and misleading testimony to be presented, was designed to portray the false impression that Birth Father was not interested in the child or in asserting his parental rights.

*Violation of Rule 4-4.1(a)*

Rule 4-4.1(a) specifies that when representing a client, a lawyer shall not knowingly "make a false statement of material fact or law to a third person …." Krigel violated this rule in his communication with Zimmerman, indicating the child would not be adopted without Birth Father's consent. Further, at the time Krigel spoke with

7

Zimmerman, Krigel knew that he advised Birth Mother not to communicate with Birth Father regarding any information about the child, including the child's birth or subsequent adoption proceedings.

*Violation of Rule 4-4.4(a)*

Rule 4-4.4(a) requires that in representing a client, a lawyer "shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person …." By actively concealing factual information from Birth Father and his counsel so that his client's position would prevail, Krigel violated this rule. Comment one to this rule provides, in pertinent part: "Responsibility to a client requires a lawyer to subordinate the interests of others to those of the client, but that responsibility does not imply that a lawyer may disregard the rights of third persons."

Krigel advised Birth Mother and her family to have no contact with Birth Father and to not divulge any information to Birth Father regarding the birth of their child. Krigel communicated with Zimmerman, indicating that the child would not be adopted without Birth Father's consent. Further, Krigel advised Birth Mother and Birth Father to receive "counseling" from Merryfield, who was actively working with Birth Mother to place the child in an adoptive home. Despite actual knowledge that Birth Father wanted to raise the child, Krigel pursued a course of action that disregarded the parental rights of Birth Father and the best interests of the child in remaining with a natural parent. Krigel's actions served no substantial purpose other than to impair and delay Birth Father's assertion of his parental rights.

8

*Violation of Rule 4-8.4(d)*

Rule 4-8.4(d) provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice …."  Krigel signed and submitted two documents to the trial court, which hindered the administration of justice.

Krigel signed and submitted a "Petition to Approve, Consent, and Transfer of Custody" to the trial court, stating that Birth Mother did not know of any "other person not a party to these proceedings who has physical custody of the child or claims to have custody or visitation rights with respect to the child."  This was not a true statement in that Krigel knew the name, address, and attorney for Birth Father.  Birth Father was not a party to the proceedings, but one who had a claim of child custody or visitation.

The opportunity for Birth Father to assert his parental rights actively was thwarted by Krigel's violation of this rule.

## Discipline

This Court finds by a preponderance of the evidence that Krigel committed the foregoing rule violations, amounting to multiple acts of professional misconduct.  Accordingly, this Court must determine the appropriate discipline to impose.  "This Court relies on the ABA Standards when imposing sanctions to achieve the goals of attorney discipline."  *In re Coleman*, 295 S.W.3d 857, 869 (Mo. banc 2009).[2]

---

[2] This Court recognizes that the ABA Standards are used for guidance in imposing attorney discipline, and the most recent ABA Standards were published in 2013.  *See In re Ehler*, 319 S.W.3d 442, 451 (Mo. banc 2010).

9

*Factors Governing Discipline*

This Court has the inherent authority to regulate the practice of law and administer attorney discipline. *In re Zink*, 278 S.W.3d 166, 169 (Mo. banc 2009). The purpose of imposing discipline is not to punish the attorney but to protect the public and maintain the integrity of the legal profession. *In re Stewart*, 342 S.W.3d 307, 308 (Mo. banc 2011). "Those twin purposes may be achieved both directly, by removing a person from the practice of law, and indirectly, by imposing a sanction which serves to deter other members of the Bar from engaging in similar conduct." *In re Kazanas*, 96 S.W.3d 803, 807-08 (Mo. banc 2003).

It is this Court's duty to determine what discipline is appropriate to impose for these violations by reviewing similar past cases, the disciplinary rules, and the applicable ABA standards. *Stewart*, 342 S.W.3d at 310. This Court notes that generally when considering what sanction to impose, this Court considers four factors:

(a) the duty violated;
(b) the lawyer's mental state;
(c) the potential or actual injury caused by the lawyer's misconduct; and
(d) the existence of aggravating or mitigating factors.

*ABA Standard* 3.0 (2013 Ed.) When this Court finds an attorney has committed multiple acts of misconduct, "the ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among the violations." *Coleman*, 295 S.W.3d at 870 (internal citations omitted).

*Appropriate Discipline*

This Court determined Krigel committed professional misconduct in violation of Rule 4-3.3(a)(3), Rule 4-4.1(a), Rule 4-4.4(a), and Rule 4-8.4(d). Once misconduct is

established, this Court may consider aggravating and mitigating factors when deciding what sanction to impose. [3] *ABA Standard* 9.1. The record contains evidence of both factors. With respect to aggravating factors, Krigel committed multiple offenses and fails to grasp the severity of these charges. However, in mitigation, Krigel has been a practicing attorney for more than thirty years with no disciplinary history prior to this incident.

Krigel's most egregious act of misconduct was lack of candor toward the tribunal. Generally, "when an attorney, with an intent to deceive the court, submits a false document, makes a false statement, or withholds material information, disbarment is the appropriate sanction." *In re Caranchini*, 956 S.W.2d 910, 919 (Mo. banc 1997); *see also ABA Standard* 6.11.

Disbarment is "reserved for clear cases of gross misconduct, those in which the attorney is demonstrably unfit to continue in the profession." *In re Ver Dught*, 825 S.W.2d 847, 851 (Mo. banc 1992) (suspending the attorney for his belief that the law did not require him to disclose facts that he believed were not material and no material fact was falsified). The dissent believes that Krigel should be disbarred from the practice of law, comparing Krigel's conduct to that of the attorney in *In re Oberhellmann*, 873 S.W.2d 851 (Mo. banc 1994). In *Oberhellmann*, the attorney's misrepresentations were made in two separate and unrelated cases. *Id.* at 853.[4] In one case, the attorney affirmatively instructed his client to perjure herself on the witness stand, and in the other

---

[3] The DHP did not address aggravating or mitigating factors in its decision.

[4] These misrepresentations were made in the United States District Court for the Eastern District of Missouri and the United States District Court for the Central District of Illinois. *Id.* at 853-54.

11

case, the attorney forged his former legal associate's signature on a document submitted to the court. *Id.* at 853 and 855. The analogy of Krigel's conduct to *Oberhellmann* is inapposite.

A lesser sanction of suspension may be appropriate in cases when "the attorney merely knows of the misrepresentation …." *Caranchini*, 956 S.W.2d at 919. "Suspension is appropriate only if a lawyer knows that a false statement is being submitted to a court and takes no remedial action." *Oberhellmann*, 873 S.W.2d at 856. Turning to *ABA Standards*, this Court finds the appropriate recommended range of discipline to be reflected in *ABA Standard* 6.12.

> Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

*Id.*

There must be significant discipline to maintain the public's trust and protect the integrity of the legal system; accordingly, Krigel's request that no sanction be imposed is not appropriate. Krigel's conduct in this matter was not passive; he knew material information was withheld from the trial court, and he took no remedial action during any of the proceedings.

However, this is Krigel's first disciplinary matter before this Court. "This Court adheres to a practice of applying progressive discipline when imposing sanctions on attorneys who commit misconduct." *In re Forck*, 418 S.W.3d 437, 444 (Mo. banc 2014). Considering Krigel has never been disciplined by this Court and has specialized in this

12

area of law for more than thirty years without complaint, disbarment is an inappropriate sanction.

In accord with the *ABA Standards*, this Court suspends Krigel from the practice of law, with execution of such suspension stayed, subject to Krigel's completion of a two-year term of probation in accordance with conditions imposed by this Court. This sanction is designed to maintain the public's trust, protect the integrity of the legal system, and is supported by prior disciplinary proceedings. *See Ver Dught*, 825 S.W.2d at 850-51. Should Krigel not comply with this Court's discipline by violating the terms of his probation, he may be subject to having his probation revoked or further discipline being imposed. Rule 5.225(f)(2).

## Conclusion

Krigel is suspended from the practice of law for six months, with execution of such suspension stayed, subject to Krigel's completion of a two-year term of probation in accordance with conditions imposed by this Court.

_____
GEORGE W. DRAPER III, JUDGE

Stith and Russell, JJ., concur; Breckenridge, C.J., concurs in part and dissents in part in separate opinion filed; Fischer, J., dissents in separate opinion filed; Wilson and Teitelman, JJ., concur in opinion of Fischer, J.

13



# SUPREME COURT OF MISSOURI
## en banc

In re:  SANFORD P. KRIGEL,      )
                                  )     No.  SC95098
               Respondent.     )

**OPINION CONCURRING IN PART AND DISSENTING IN PART**

I agree with the discipline imposed by the majority opinion.  I respectfully differ from the majority opinion's findings and analysis, however, as to the rules violated by Mr. Krigel.  While I find that Mr. Krigel violated Rule 4-3.3(a)(3), Rule 4-4.1(a), and Rule 4-8.4(d), I do not believe that Mr. Krigel's failure to provide factual information to a potential opposing party constituted a violation of Rule 4-4.4(a).

I agree with the following factual findings made by the disciplinary hearing panel:

12.  [Mr. Krigel] first met with the expectant mother and her family on March 11, 2010.  At that meeting, [Mr. Krigel] was provided background on the relationship between the expectant parents and how it had deteriorated after the disclosure of the pregnancy to their families.  The expectant mother indicated that she and the expectant father had originally planned to raise the child together, but with the deterioration of the relationship it would be best for the child to be adopted by a family.

13. During the first meeting between [Mr. Krigel] and the expectant mother, [Mr. Krigel] was advised of the name and whereabouts of the expectant father and the due date of April 8, 2010.  The expectant mother and her family told [Mr. Krigel] that the expectant parents were to communicate only through attorneys.

14. At this meeting the expectant mother and her family advised [Mr. Krigel] that the expectant father would not consent to an adoption.

15. Also at this meeting, [Mr. Krigel] explained to the expectant mother her rights under Missouri law and the rights of a biological father to assert paternity. [Mr. Krigel] testified that this explanation included a description of the timeframes within which an expectant father was to assert his parental rights in order to have his consent required for an adoption.

16. At the March 11, 2010 meeting [Mr. Krigel] was retained to assist the expectant mother with pursuing termination of her parental rights in anticipation of a subsequent adoption proceeding.

17. There was no reasonable doubt in the minds of the expectant parents or their counsel as to the actual paternity of the child.

18. In his representation of the expectant mother [Mr. Krigel] employed what he referred to as a "passive strategy." Under this strategy [Mr. Krigel] and his client would "actively do nothing" to communicate with the expectant father or his counsel, and would not advise the expectant father or his counsel of adoption plans, the actual birth of the child, and the institution of any legal proceedings.

19. On or about March 19, 2010, [Mr. Krigel] received a call from the expectant father's attorney, Mr. Zimmerman, whom [Mr. Krigel] had known since junior high school. [Mr. Krigel] knew that Mr. Zimmerman practiced law primarily in Kansas and did not believe that Mr. Zimmerman typically handled adoption or paternity matters.

20. In this call, Mr. Zimmerman told [Mr. Krigel] that he represented the expectant father, and that the father wanted to raise the child and would not consent to an adoption. In response, [Mr. Krigel] indicated to Mr. Zimmerman that, without father's consent, there would not be an adoption. Mr. Zimmerman took [Mr. Krigel's] comment to be a statement of fact. Following their call, Mr. Zimmerman heard nothing further from [Mr. Krigel] with respect to the pregnancy, the birth of the child, or the institution of any adoption proceedings.

21. In the March 19, 2010 call, Mr. Zimmerman told [Mr. Krigel] that he believed the expectant parents needed to have some counseling about their situation, without involvement of their respective families. [Mr. Krigel] suggested to Mr. Zimmerman that they meet with Ms. Merryfield. At the

2

time of [Mr. Krigel's] discussion with Mr. Zimmerman, [Mr. Krigel] knew Ms. Merryfield had already begun working with the expectant mother.

22. Following the call with [Mr. Krigel], Mr. Zimmerman contacted Ms. Merryfield to set up an appointment for the expectant parents to receive counseling about their situation and how they might come to agreement as to a course of action. That meeting occurred on March 22, 2010. [Mr. Krigel] testified that he would not have mentioned his "passive strategy" to Ms. Merryfield because "she would have understood exactly what we were doing" and talking about it wouldn't be necessary.

23. At the March 22 meeting, the expectant father said he would not consent to an adoption and that he wanted to raise the child, preferably with the expectant mother.

24. Following the March 22 meeting, Ms. Merryfield advised [Mr. Krigel] that the expectant father stated he did not want to consent to an adoption. Ms. Merryfield's assessment of the expectant father was that he was quiet, sad and passive, and she advised [Mr. Krigel] that she thought the expectant father wasn't likely to contest the adoption.

25. Late in March 2010, the expectant mother sent the expectant father a message falsely stating that her doctor had revised the due date from April 8 until May 1. The expectant father had been barred from attending the doctor appointments with the expectant mother and was deceived by her statements.

26. The baby was born on April 3, 2010. Neither the father nor his attorney was notified of the birth. The father's name was not shown on the birth certificate. . . . [T]he failure to notify the father or his attorney was purposeful and based on legal advice provided by [Mr. Krigel], and was designed to impair the father's ability to assert his parental rights.

27. On April 6, 2010 a hearing was held in Jackson County, Missouri before Commissioner Merrigan, for the purpose of having the birth mother tender her consent to terminate her parental rights, preparatory to adoption proceedings being instituted. [Mr. Krigel] appeared on behalf of the mother. Neither the father nor his attorney received notice of the hearing and neither was aware of the birth of the child.

28. At the April 6, 2010 hearing, in response to [Mr. Krigel's] questioning, the mother provided false testimony, stating that she had done nothing to defraud or mislead the father which was not true in light of the fact she had

3

given him false information regarding the expected due date. [Mr. Krigel] testified . . . that he was not aware that the mother had provided the father with a false due date.

29. At the April 6 hearing, in response to [Mr. Krigel's] question, the mother agreed that the father "had been consulted at length about the matter." [Mr. Krigel] knew that his "passive strategy" called for no communication following the initial counseling session with Ms. Merryfield and that his questioning suggested to the Court that there had been more consultation than was the case.

30. [Mr. Krigel] testified . . . that he knew the father believed the mother's due date to be April 8. Having instructed his client not to communicate with the father, at the time of the April 6 hearing [Mr. Krigel] was aware that his strategy had prevented the father from knowing that the baby had been born, and from coming forward in advance of the April 6 hearing. [Mr. Krigel] was also aware that the father had consistently asserted his paternity, expressed his desire to raise the child, and stated his opposition to adoption.

31. Nevertheless, at the April 6 hearing, in response to a question from [Mr. Krigel], the mother agreed with [Mr. Krigel's] statement that "even though you've talked to him and his family at some length, he has not stepped forward since the birth of the child claiming any rights to the child." [Mr. Krigel] elicited this misleading testimony knowing that his "passive strategy" had ensured that the father would not know of the birth. Further, [Mr. Krigel] posed his question fully aware that the father had consistently claimed rights to the child.

32. [Mr. Krigel's] questioning of the mother at the April 6, 2010 hearing, while addressing certain statutory elements, was designed to present to the Court the incorrect impression that the father was not interested in the birth of the child or in asserting his parental rights, when [Mr. Krigel] knew that was not the case.

33. Also on April 6, 2010, immediately following the Consent to Terminate hearing in which [Mr. Krigel] participated, a Motion to Transfer Custody and for Adoption was heard by Commissioner Merrigan and custody of the child was transferred to prospective adoptive parents.[1]

---

[1] Although not found by the disciplinary hearing panel, I note that the adoptive parents paid for the legal services Mr. Krigel rendered to Birth Mother.

34. The father learned of the child's birth and the mother's fraudulent statements at some point between May 3 and May 12, 2010. He learned this information indirectly, and not from the mother or [Mr. Krigel]. He promptly placed his name on the Putative Father Registry. Later in May he learned that adoption proceedings had already been instituted and he moved to intervene.

35. The father saw his child for the first time in a one hour supervised visit when the child was two months old. He next saw the child in one and one-half hour weekly supervised visits beginning when the child was five months old. After litigating visitation issues he obtained unsupervised visitation rights for seven hours a week when the child was eight months old. During all of this time the child was in the custody of the proposed adoptive parents.

36. On May 6, 2011, Judge Roldan of the Jackson County Circuit Court entered Judgment in the adoption proceeding, denying the petition of the adoptive parents and awarding legal and physical custody of the child to the father.

37. In establishing his parental rights and opposing the adoption, the father or his family incurred between $50,000 and $70,000 in attorney's fees.

38. To the extent the mother provided fraudulent information to the father concerning the supposed due date for the child, that behavior is not relevant to the Panel's assessment of potential professional misconduct on the part of [Mr. Krigel].

Based on these factual findings, I agree with the majority opinion that Mr. Krigel violated Rule 4-3.3(a)(3) when he knowingly elicited and permitted false and misleading testimony at the April 6, 2010 hearing that effectively represented to and caused the trial court to believe that Birth Father had knowledge of the birth of the child and had not done anything to assert his parental rights. These facts also support the majority opinion's finding that Mr. Krigel violated Rule 4-4.1(a) in that he knowingly made a false statement of material fact to a third person when he told Mr. Zimmerman that there would not be an adoption without Birth Father's consent.

5

I would not find that said facts support the majority opinion's holding that Mr. Krigel violated Rule 4-4.4(a). Rule 4-4.4(a) provides that "[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person[.]" The majority opinion finds that Mr. Krigel violated Rule 4-4.4(a) by actively concealing factual information from Birth Father and Birth Father's counsel so that his client, Birth Mother, would prevail. In doing so, the majority opinion reasons that Mr. Krigel's actions served no substantial purpose other than to impair and delay Birth Father's assertion of his parental rights. I recognize that, because the purpose of adoption proceedings is to protect and determine the best interest of the child,[2] the parties to such proceedings take on somewhat different roles than in a typical adversarial setting. But even being mindful of the special nature of such proceedings, the majority opinion's finding would require an attorney to divulge to a potential opposing party information that is not only detrimental to his or her client but also information that the majority opinion does not show the party had a legal duty to disclose at that time. Therefore, to the extent Mr. Krigel concealed information from Birth Father and Birth Father's counsel, he did so to avoid harm to his client. Here, Mr. Krigel has been found to have violated Rule 4-4.1(a) for giving false information to Birth Father's attorney. I would find that such a rule violation

---

[2] Section 453.005.1, RSMo 2009, provides that statutes pertaining to adoption "shall be construed so as to promote the best interests and welfare of the child in recognition of the entitlement of the child to a permanent and stable home."

6

sufficiently covers Mr. Krigel's conduct and, under these circumstances, I would not find that Mr. Krigel violated Rule 4-4.4(a).

Accordingly, I dissent from the majority opinion's finding that Mr. Krigel violated Rule 4-4.4(a).  Nevertheless, I agree that the multiple acts of professional misconduct committed by Mr. Krigel justify the six-month suspension from the practice of law, with execution of the suspension stayed subject to Mr. Krigel's completion of a two-year term of probation in accordance with conditions imposed by this Court.  I, therefore, concur in the majority opinion with respect to the discipline imposed.

_____

PATRICIA BRECKENRIDGE, CHIEF JUSTICE



# SUPREME COURT OF MISSOURI
## en banc

In re: Sanford P. Krigel,            )

                                  )

          Respondent.         )

                                  )

                                  )     No. SC95098

                                  )

## DISSENTING OPINION

I respectfully dissent. Every attorney licensed to practice law in this state must first take an oath. The third paragraph of that oath provides, "That I will never seek to mislead the judge or jury by any artifice or false statement of fact or law[.]" Every attorney is reminded of this sacred promise, and is required to reaffirm it, each year when they sign their annual enrollment form. Sanford Krigel knowingly violated that oath and multiple rules of professional conduct as explained in the principal opinion. The principal opinion suspends Krigel but stays that suspension and places him on probation. In my view, Krigel's actions—in misleading both opposing counsel and the circuit court—warrant suspension without leave to reapply for six months, at a minimum, but I would disbar him.

## FACTS AND PROCEDURAL HISTORY

Adoption Option, Inc., is a Kansas nonprofit corporation that is a licensed child placement agency in Missouri. Its focus is to aid infertile couples with adopting children. The founder of Adoption Option was Hillary Merryfield. She began working with the

prospective adoptive couple in this case in January 2010. However, in March 2010, she first met with the biological mother. At that time, Merryfield recommended the biological mother meet with Krigel, after the biological mother's parents requested an attorney referral. Merryfield had worked with Krigel on numerous occasions involving adoption. Krigel had been working in adoption law for more than two decades.

Krigel met with, and agreed to represent, the biological mother on March 11, 2010. Krigel later admitted that he spent fewer than 10 hours on the case and was paid $22,000[1] in fees by the prospective adoptive parents. DHP Hearing Tr. 249, 328. At this meeting, Krigel described that he would be using a passive strategy, as he described it, "to actively do nothing" to assist the father. Shortly after his representation of the biological mother began, Krigel was contacted by the father's attorney, Jeffery Zimmerman, a business and real estate attorney. During their discussion on the telephone, Zimmerman made Krigel aware of his client's concern about an adoption and was assured by Krigel that an adoption would not take place without the consent of the father. Zimmerman also recommended that the biological mother and father receive some counseling, outside the presence of their parents. Krigel recommended Merryfield, without disclosing that Merryfield had recommended the biological mother to Krigel, or that Merryfield was actively working with the biological mother in preparation of adoption.

---

[1] The circuit court judgment states the prospective adoptive parents paid $20,000 in legal fees to Krigel for his representation of the biological mother. This amount seems to be calculated solely on the prospective parents' testimony during proceedings before the circuit court; however, Krigel testified he received between $20,000-22,000 during his DHP testimony, resolving this discrepancy.

2

At the meeting with Merryfield, the father expressed that he would not consent to an adoption. Despite this, Krigel was told by Merryfield that the father was very passive, and that Merryfield felt that, while he would not consent to adoption, he would not assert his rights and actively stop an adoption. Krigel's next move was to terminate the biological mother's parental rights so custody could be transferred to the prospective adoptive parents. This occurred in a hearing on April 6, 2010. After this hearing, Krigel anticipated his representation of the biological mother would be complete. Aside from this one hearing, Krigel had spent 10 hours or less on the entire case.

Krigel's passive strategy worked so well that—had the biological mother not made comments to a thirdparty on Facebook—the father likely would not have found out about the birth of his child for months after it happened. When the father did find out about the birth, he was referred to Mike Whitsitt. Whitsitt immediately filed paperwork to have the father placed on the putative father registry and filed a paternity action. Months and $50,000-$70,000 of attorney's fees later, the father was awarded custody of his child.

### DISCPLINE HEARING PANEL FINDINGS AND CONCLUSIONS

The DHP made numerous factual findings and conclusions regarding Krigel's conduct. The principal opinion acknowledges these findings and conclusions are supported by the record. Some of the DHP's findings and conclusions that are significant include:

> 25. Late in March 2010, the expectant mother sent the expectant father a message falsely stating that her doctor had revised the due date from April 8 until May 1. The expectant father had been barred from attending the doctor appointments with the expectant mother and was deceived by her statement.

3

26. The baby was born on April 3, 2010. Neither the father nor his attorney was notified of the birth. The father's name was not shown on the birth certificate. The Panel finds the failure to notify the father or his attorney was purposeful and based on legal advice provided by Respondent, and was designed to impair the father's ability to assert his paternal rights.

27. On April 6, 2010 a hearing was held in Jackson County, Missouri before Commissioner Merrigan, for the purpose of having the birth mother tender her consent to terminate her parental rights, preparatory to adoption proceedings being instituted. Respondent appeared on behalf of the mother. Neither the father nor his attorney received notice of the hearing and neither was aware of the birth of the child.

28. At the April 6, 2010 hearing, in response to Respondent's questioning, the mother provided false testimony, stating that she had done nothing to defraud or mislead the father which was not true in light of the fact she had given him false information regarding the expected due date. Respondent testified to this Panel that he was not aware that the mother had provided the father with a false due date.

29. At the April 6 hearing, in response to Respondent's question, the mother agreed that the father "had been consulted at length about the matter." Respondent knew that his "passive strategy" called for no communication following the initial counseling session with Ms. Merryfield and that his questioning suggested to the Court that there had been more consultation than was the case.

30. Respondent testified to this Panel that he knew the father believed the mother's due date to be April 8. Having instructed his client not to communicate with the father, at the time of the April 6 hearing Respondent was aware that his strategy had prevented the father from knowing that the baby had been born, and from coming forward in advance of the April 6 hearing. Respondent was also aware that the father had consistently asserted his paternity, expressed his desire to raise the child, and stated his opposition to adoption.

31. Nevertheless, at the April 6 hearing, in response to a question from Respondent, the mother agreed with Respondent's statement that "even though you've talked to him and his family at some length, he has not stepped forward since the birth of the child claiming any rights to the child." Respondent elicited this misleading testimony knowing that his "passive strategy" had ensured that the father would not know of the birth. Further, Respondent posed his question fully aware of the fact that the father had consistently claimed rights to the child.

4

32. Respondent's questioning of the mother at the April 6, 2010 hearing, while addressing certain statutory elements, was designed to present to the Court the incorrect impression that the father was not interested in the birth of the child or in asserting his parental rights, when Respondent knew that was not the case.

40. The Panel finds that Respondent employed his "passive strategy" for the express purpose of impairing the father's ability to establish his parental rights under the Putative Father Registry or otherwise.

41. In conducting his examination of the birth mother at the April 6, 2010 hearing, Respondent asked questions designed to elicit answers that misrepresented the facts of the situation, as known to Respondent, and that served to mislead the Court with respect to the true circumstances of the case, in violation of Supreme Court Rule 4-3.3(a)(3).

42. In his telephone conversation with the father's attorney, Mr. Zimmerman, Respondent made a false statement that there would be no adoption without the father's consent, in violation of Supreme Court Rule 4-4.l(a), and made no subsequent effort to advise the attorney otherwise.

43. Under the circumstances of this case, and given Respondent's clear understanding as to the identity of the father, that the father was not willing to consent to an adoption, and that the father wanted to raise his child, Respondent's conduct, including his conversation with Mr. Zimmerman, his instructions to the mother and her family to have no communication with the father, and his overall implementation of his "passive strategy" to "actively do nothing," had no substantial purpose other than to impair and delay the father's assertion of his parental rights in violation of Supreme Court Rule 4-4.4(a).

44. Respondent's overall conduct in this matter, including his interaction, and failure to interact, with the father's counsel, the implementation of his "passive strategy," and his conduct at the April 6, 2010 hearing, constituted conduct prejudicial to the administration of justice, in violation of Supreme Court Rule 4-8.4(d).

46. As a result of Respondent's misconduct, the father was largely denied access to his child for the first year of its life, and the father and his family incurred substantial expense in establishing his parental rights and preventing the child's adoption.

DHP Decision at pp. 5-7, 8-9.  The DHP recommended Krigel be suspended without leave to reapply for a period of six months.  Neither the DHP nor OCDC recommended probation and staying the suspension of Krigel's license to practice law.

## DISCUSSION AND DISCIPLINE

The most serious of Krigel's violations is that of Rule 4-3.3(a)(1).  It provides: "A lawyer shall not knowingly: make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."

In addition to the factual findings and conclusions of the DHP, the circuit court's judgment—which eventually removed the child from the prospective adoptive parents and placed custody with the father—in this case is equally enlightening.  It begins with the following quotation: "The facts of this case shock the justice system that the people of Missouri enjoy.  The Court finds the actions of officers of this Court [referring to Krigel] to be at minimum disturbing to the administration of justice." Further, the circuit court made additional findings that even provide a more complete picture of Krigel's conduct.  They include:

> [The biological mother], through her attorney, Mr. Krigel, assured [the father], through Jeff Zimmerman, that no adoption would take place without [the father's] consent, inducing him to forego protecting his parental rights under the statute, to file with the Putative Father Registry within fifteen (15) days after his child's birth, or to file a paternity action.  It was reasonable for [the father] to have believed that there was going to be no adoption.
>
> . . .
>
> In assessing the attorney's fees the Court takes into consideration the following factors: . . . (8) by the [proposed adoptive parents'] own

6

testimony, they have paid [Krigel's fees of] Twenty Thousand Dollars ($20,000.00) for a minimal role in the litigation[.]

. . .

Just because the fraud practiced upon the natural father and this Court by the [biological] mother and the [prospective adoptive parents] does not fit neatly into one of the statutory exceptions does not mean this Court cannot remedy that fraud.

Judgment at 15-20. The circuit court described exactly what this situation was: a fraud on the circuit court that resulted in a father not receiving custody of his child for in excess of a year, and Krigel receiving $22,000 "for a minimal role in the litigation."

Here, the DHP found Krigel "asked questions designed to elicit answers that misrepresented the facts of the situation" and were used to mislead—and arguably intended to deceive—the circuit court. This, coupled with the "passive strategy" designed to mislead opposing counsel and the father, created a web of fraud entangling these entire proceedings.[2]

Accordingly, I agree with the portion of the principal opinion that states "Krigel's most egregious act of misconduct was lack of candor toward the tribunal. Generally, 'when an attorney, with an intent to deceived the court, submits a false document, makes a false statement, or withholds material information, disbarment is the appropriate sanction.'" Principal. op. at 11 (quoting *In re Caranchini*, 956 S.W.2d 910, 919 (Mo. banc 1997)). Violations of Rule 4-3.3(a) have traditionally resulted in disbarment or

---

[2] As the principal opinion points out, the father asserted, from the outset, he wanted to raise his child, and the biological mother and her parents' initiated steps to prevent him from doing so. Principal Op. at 2. Further, from the outset Krigel had the father's name and residence and knew the father would not consent to an adoption. *Id.* at 3. As soon as he became aware of the birth, the father retained new counsel with experience in adoption law, placed his name on the putative father registry, and intervened in the adoption proceedings.

7

indefinite suspension. *See In re Carey*, 89 S.W.3d 477 (Mo. banc 2002) (attorneys that made misstatements of material fact to a court should be suspended indefinitely); *In re Caranchini*, 956 S.W.2d 910 (Mo. banc 1997) (attorney was disbarred for "falsely representing to the court that she lacked knowledge of a potential party's change of residence and . . . that she could connect the testimony of work environment witnesses to her client." *Id.* at 918.); *In re Storment*, 873 S.W.3d 227 (Mo. banc 1994) (attorney's conduct warranted disbarment when he knowingly elicited false testimony from his client in order to deceive the circuit court).

In *In re Oberhellmann*, Elmer Oberhellmann was charged with violating Rules 3.3(a)(1),(4); 5.5(a); 8.4(a), (c)-(d). 873 S.W.2d 851, 852 (Mo. banc 1994). The charges stemmed from Oberhellmann's representation of two separate clients. *Id.* at 853. Oberhellmann represented the first client in a medical malpractice suit, filed under diversity jurisdiction in the United States District Court, Eastern District of Missouri. *Id.* When Oberhellmann filed his complaint, he stated that his client was a resident of Texas. *Id.* Later, while answering interrogatories, Oberhellmann stated that his client lived at Oberhellmann's mother's address in Illinois. *Id.* Eventually, the case was dismissed after the fraud was discovered. *Id.* The misconduct involving the second client revolved around a soured law partnership. *Id.* at 854. Oberhellmann had been practicing with another attorney but later ended their association. *Id.* at 855. Afterward, Oberhellmann filed a motion to withdrawal his former partner from representation on a case that had already been settled. *Id.* In so doing, Oberhellmann forged his former partner's name, and that forgery was later reported to the court by Oberhellmann's former partner. *Id.*

8

The Court in imposing its sanction held:

> In cases of false statements, fraud, or misrepresentation, this Court issues reprimands only if the lawyer is merely negligent in determining whether statements or documents are false. Respondent was more than negligent; therefore, public reprimand is not appropriate. Nor is suspension appropriate. Suspension is appropriate only if a lawyer knows that a false statement is being submitted to a court and takes no remedial action. Disbarment is the appropriate sanction for respondent. Disbarment is appropriate when a lawyer, *with the intent to deceive a court, makes a false statement or submits a false document to a court.*

*Id.* at 856 (internal citations omitted) (emphasis added).

The principal opinion turns an "about face" from this precedent in merely suspending Krigel, staying the suspension, and permitting Krigel to continue to practice on probation. That result does not protect the public nor the integrity of the legal profession. At a minimum, this Court's case law, and the recommendation of the DHP, require Krigel be indefinitely suspended with no leave to apply for reinstatement for six months, but my view is his actions warrant disbarment.

_____
Zel M. Fischer, Judge

9